# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

TERRENCE TIMMONS,

   *Plaintiff,*

vs.              Case No. 14-2272-EFM

AGC FLAT GLASS NORTH AMERICA,
INC.,

   *Defendant.*

## MEMORANDUM AND ORDER

   Plaintiff Terrence Timmons brings suit against Defendant AGC Flat Glass North America, Inc. ("AGC") alleging race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  Before the Court is Defendant's Motion for Summary Judgment.  Because the Court finds that there are no genuine issues of material fact as to whether Defendant engaged in race discrimination or retaliation, the Court grants Defendant's motion.

## I.  Factual and Procedural Background[1]

   Plaintiff Terrence Timmons is an African-American male. Defendant AGC is a glass manufacturer that operates a glass manufacturing plant in Spring Hill, Kansas. Plaintiff began

---

[1] In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts.

working for Defendant on July 8, 2013, as a tempering technician in the Tempering Department. Tempering technicians work on the production floor around and near fast moving machines and powered conveyor belts.

Plaintiff's job functions included inspecting glass passing by on the tempering line to ensure quality and dimension specifications, packing glass off of the tempering line, and closing racks of glass with stretch wrap. When packing glass, tempering technicians are required to wear a jacket because packing involves removing glass from the tempering line—a fast moving set of conveyor belts and rollers. The jacket is designed to prevent cuts should the glass break.

Plaintiff attended new hire training and orientation at Defendant. New hire training and orientation lasts approximately two to three days. On July 8, 2013, Plaintiff acknowledged receipt of Defendant's Employee Handbook and the policies within the handbook. Defendant maintains a written Equal Employment Opportunity policy and a written Anti-Harassment policy. Both of these polices are contained in the Employee Handbook. Plaintiff acknowledged his understanding of the policies in the handbook.

Defendant's Employee Handbook also contains Defendant's written "Introductory Period of Employment" policy ("Introductory Period policy"). The Introductory Period policy states that an employee's initial ninety days of employment are considered an "introductory period." An employee's performance on the job and potential abilities are evaluated by Defendant during an employee's initial ninety days.  There is no written policy differentiating discipline between probationary employees versus discipline for full-time employees. Plaintiff understood that during the Introductory Period, Defendant would be evaluating his work closely to determine if he was appropriate for continued employment.  Defendant trained Plaintiff on its Introductory

Period policy.  Plaintiff's period of employment occurred entirely during the introductory period, and Plaintiff worked at Defendant for thirty-six days.

Defendant also maintains a written Absenteeism and Tardiness policy ("Attendance policy"). This policy states that an employee is permitted to miss no more than 2% of work in a rolling twelve month period. Plaintiff understood this policy.

On July 8, 2013, Plaintiff completed a new hire orientation safety tour. Jay Mercer, Behavioral Based Safety ("BBS") Coordinator for AGC, led this tour. Mercer conducts new hire orientation safety training in his office and also leads a tour of Defendant's production floor. During the new hire safety training, Mercer fitted Plaintiff with the proper Personal Protective Equipment ("PPE"), including a packing jacket, for Plaintiff's job duties in the Tempering Department. Mercer also trained Plaintiff on Defendant's Plant Safety Rules. Defendant's Plant Safety Rules relating to hair length provides:

> Length of Hair: Long hair becomes a real hazard and can be caught in moving equipment when not worn in a manner to contain it. Any hair that comes into contact with an individual's shoulder will be required to be secured firmly in a hat, scarf, hair net or pinned firmly in a bun. Hair that is tied back that presents a similar risk situation must be contained or secured to avoid injury.

Plaintiff has long hair, worn in a style referred to a "dreadlocks."  During Plaintiff's interview, Plaintiff states that he was told that his hair would not be a problem so long as he could tie it back.  During new hire training, Mercer observed Plaintiff's long hair and advised Plaintiff that it would need to be contained for safety issues.[2]  Mercer also advised Plaintiff that so long as he

---

[2] The Court notes that Plaintiff attempts to controvert several of Defendant's factual statements but fails to appropriately do so. Defendant oftentimes provides an affidavit in which the affiant avers to the fact or Defendant cites to deposition testimony supporting the factual statement. Plaintiff states that the fact is "disputed," but he fails to cite to contrary testimony addressing the *relevant* issue. Frequently, Plaintiff interposes argument instead of addressing the factual statement. In addition, Plaintiff *frequently* fails to provide the relevant evidence to support his factual statements in his opposition brief. Thus, the Court only includes the facts that are supported by the evidence.

complied with Defendant's Length of Hair policy, his long hair would not be at issue. Initially, Plaintiff was not required to have his hair tucked inside of the packing jacket but instead only tied back.

After Plaintiff completed his new hire orientation safety tour and training, he started working in the Tempering Department. Plaintiff's hair, even when worn tied back in a ponytail, still came in contact with his shoulder.

In July of 2013, Plaintiff's supervisors were Andy Hicks and Kelly Sullivan. Shortly after Plaintiff started work at Defendant, Hicks and Sullivan began observing Plaintiff packing glass on the production floor with his ponytail uncontained, in violation of Defendant's Length of Hair policy. On more than one occasion in July 2013, Hicks and Sullivan explained to Plaintiff that he needed to contain his long hair by tucking his ponytail inside his packing jacket while packing glass on the production floor. Hicks and Sullivan had at least three conversations with Plaintiff regarding tucking his hair inside his jacket to comply with the safety policy relating to hair.

On more than one occasion in July 2013, Joe Milliman, a senior supervisor, observed Plaintiff in the Tempering Department packing glass with his hair uncontained. Milliman communicated his observations to Defendant's Human Resources Manager, Rodney Boone, Mercer, Hicks, and Sullivan. Defendant's Safety Manager, Aaron Ralston, also observed Plaintiff in July 2013 packing glass without his ponytail contained. Ralston told Plaintiff that he needed to tuck his hair inside his jacket for safety reasons.

Due to the size of the packing jacket Plaintiff was initially issued, his hair would occasionally slide out of the jacket because the job required Plaintiff to move constantly and pick

up glass. Boone told Plaintiff that he would ensure that a larger jacket was provided to him. Plaintiff states that he never received a larger jacket.

On July 22, 2013, Plaintiff was tardy to his shift. On or around July 24, Hicks noted several deficiencies in Plaintiff's work performance.   On July 29, Plaintiff was absent for his shift.

On July 29, Mercer sent an email to Hicks, Sullivan, Boone, and other members of Defendant's management, outlining his concerns related to Plaintiff's hair. Specifically, Mercer's email stated:

> Is Terrance still with us? I went back to tempering and was asking about him but one of the guys said that he was absent today and didn't know why. I have been hearing about his hair and want to check with you about how it is being secured. He should have it wrapped up in a very tight pony and then according to the Handbook it MUST BE CONTAINED or SECURED TO AVOID INJURY. Unfortunately the policy doesn't tell you how to contain or secure the hair. I am concerned by this because I don't know if he can tight roll his hair and get it under his jacket like Chris Paulsen and Sandy Shaw do. Please get [Ralston] and [Boone] involved if his hair can't be contained properly because if not they may have to make an employment decision on him because of his hair or he may have to cut his hair. With all the rolls in tempering I think that we are asking for trouble if we don't resolve this issue quickly. Thanks.

In response to this email, Boone advised Mercer that the issue had already been taken care of.

On July 30, Plaintiff received written discipline from Hicks in the form of (1) a final warning from his supervisor for attendance; and (2) counseling from his supervisor explaining the safety aspect of Plaintiff's hair and directing Plaintiff to tuck his hair into his jacket.  Plaintiff agrees with the July 30 final warning he received from Hicks for his unacceptable attendance rate because it was warranted and justified under Defendant's Attendance Policy.   Plaintiff acknowledges that he received counseling from Hicks prior to, and on July 30, directing Plaintiff to tuck his hair inside his jacket. Plaintiff did not express opposition to the attendance warning or

the directive regarding his hair and signed the final warning form. Plaintiff had no further attendance issues after the July 30 warning.

Plaintiff believed that he was being targeted by Hicks because of his hair. Plaintiff complained to Hicks and Sullivan that he felt like he was being treated unfairly. In addition, Plaintiff talked to Hicks and Sullivan on a number of occasions regarding the continual questions and treatment he received about his hair.   Plaintiff did not specifically complain about discrimination to Hicks or Sullivan.  Plaintiff asked them why the "white guy" over in the Cold-End department did not have to tuck his hair into his jacket.  Hicks told Plaintiff that Defendant is "not going to change the policy for your hair."

On July 31, Milliman sent an email to Hicks and Sullivan advising them that he had observed Plaintiff packing glass on the production floor with his hair uncontained. Milliman also sent this email to Mercer to ensure that Mercer was advised of the safety issue by not tucking his hair inside of his packing jacket.  Mercer responded to this email advising Milliman that he had a similar concern but that he understood that the issue had been resolved.

In August 2013, Hicks was Plaintiff's supervisor. In early August 2013, Milliman again observed Plaintiff packing glass on the production floor with his uncontained. On August 12, Milliman notified Hicks that he had observed Plaintiff violating Defendant's Length of Hair policy.   On or around August 13, Hicks noted additional deficiencies in Plaintiff's work performance.  Hicks noted that Plaintiff, an introductory period employee, had an unacceptable attendance rate, unsatisfactory work performance, and repeated safety violations that warranted his discharge. Hicks consulted with Boone, and after consultation, Hicks made the decision to

discharge Plaintiff.[3]   Hicks states that he made the decision to discharge Plaintiff because Plaintiff, in his introductory period of employment, had only worked for Defendant for thirty-six days and had (1) an absentee rate of 7.4% (in excess of the 2% rate); (2) repeatedly violated Defendant's Length of Hair policy by not having his hair properly contained which created a safety risk; and (3) several deficiencies in his work performance.

Plaintiff was discharged on August 14. Hicks and Sullivan were present during this August discharge meeting. During the termination meeting, Plaintiff stated that he did not believe that they were holding another guy to the same standard as Plaintiff regarding having his hair contained.

Plaintiff's specific hairstyle, dreadlocks, was never discussed during his employment with Defendant. Plaintiff's race was never discussed in connection with his employment with Defendant.  Dreadlocks are not exclusively worn by African Americans. Plaintiff was not subject to racial slurs, racial jokes, or racially offensive images during his employment.

Ralston, Mercer, Milliman, Hicks, and Sullivan have not observed, and have not been notified of, any employee, other than Plaintiff, who did not secure and contain their long hair while working on the production floor. Two other employees worked for Defendant who had long hair. Chris Paulsen began working for Defendant on May 23, 1989. Paulsen is a Caucasian male with long hair. In July and August 2013, Paulsen worked in the Cold-End Department. Paulsen's supervisors in July and August 2013 were Glen Billups and Steve Hammar. Paulsen had no written or final warnings in effect in July or August 2013. Paulsen secured his long hair by keeping it tied back in a ponytail and placing his ponytail down the back of his shirt. He

---

[3] The Court notes again that Plaintiff attempts to dispute numerous facts surrounding his discharge, but the evidence Plaintiff cites to does not controvert Defendant's evidence.

began placing his ponytail down the back of his shirt years before Defendant implemented the Length of Hair policy. He did not wear a packing jacket and did not place his hair inside of the jacket. Plaintiff claimed that he observed Paulsen with his hair outside of a jacket.

Ralston was hired by Defendant as the Safety Manager in January 2013. Ralston is a Caucasian male with long hair, and he reports directly to the Plant Manager. As the Safety Manager, Ralston is responsible for all aspects of plant safety and is qualified to identify safety risks associated with activity on the production floor.  Ralston visits the production floor each day to conduct a safety walk-through. During the walk-throughs, he generally does not approach the moving machinery and stays behind the yellow safety line. Ralston was observed walking through the plant without having his hair tucked under his jacket. Sometime in 2013, Milliman gave Ralston a verbal warning and told Ralston that he should place his long ponytail up under his hardhat to set a good example for employees working on the production floor. Ralston did not receive any written discipline. He began placing his hair under his hard hat.

Plaintiff filed this Complaint in June 2014. Plaintiff brings claims of race discrimination and retaliation under both Title VII and 42 U.S.C. § 1981.[4] Defendant now seeks summary judgment on all of Plaintiff's claims as well as on Plaintiff's claim for back pay (Doc. 29). Defendant also has a Motion for Sanctions for Spoliation of Evidence (Doc. 27). In that motion, Defendant seeks the dismissal of Plaintiff's claim for back pay or alternatively exclusion of Plaintiff's testimony relating to Plaintiff's job search for which no written records exist.[5]  The

---

[4] In Plaintiff's response to Defendant's Motion for Summary Judgment, Plaintiff affirmatively disavows a hostile work environment or harassment claim.

[5] Plaintiff also has a pending Unopposed Motion for Leave to Exceed the Page Limit (Doc. 41).  This Court's standing order limits summary judgment briefs (including facts and argument) to fifty pages. Plaintiff's brief is seventy-two pages.  Plaintiff filed his motion for leave to exceed the page limit approximately one month *after* he

Court will only address Defendant's Motion for Summary Judgment as the outcome of that motion renders Defendant's Motion for Sanctions moot.

## II.        Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[6] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[7]  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[8]  If the movant carries this initial burden, the nonmovant that bears the burden of persuasion at trial may not simply rest on its pleading but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[9] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[10]  The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[11]

---

already filed his opposition brief (Doc. 37).  Although Plaintiff improperly followed the procedures and rules set forth by this Court, the Court nevertheless grants the motion and will consider the arguments and facts as set forth in Plaintiff's opposition brief (already filed and in excess of the page limits).

[6] Fed. R. Civ. P. 56(a).

[7] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[8] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[9] *Id*. (citing Fed. R. Civ. P. 56(e)).

[10] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[11] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III.    Analysis

Plaintiff brings race discrimination and retaliation claims under both Title VII and § 1981. The Court will first address Plaintiff's racial discrimination claims. Next, the Court will address Plaintiff's retaliation claims.

### A. Race Discrimination Claims under Title VII and § 1981

Plaintiff has no direct evidence of race discrimination, and thus his claim is subject to the *McDonnell Douglas* burden-shifting scheme.[12] Racial discrimination claims brought under either Title VII or § 1981 have the same elements.[13] First, Plaintiff must establish a prima facie case of discrimination.[14] The burden then shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its decision.[15] Finally, the burden shifts back to Plaintiff to demonstrate that Defendant's reason is pretext for race discrimination.[16]

#### 1. *Prima facie case*

The elements of a prima facie case of race discrimination may vary depending on the circumstances of the case.[17] Generally, "a plaintiff must demonstrate: (1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was

---

[12] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1972).

[13] *Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995) (citation omitted).

[14] *McDonnell Douglas*, 411 U.S. at 802.

[15] *Id.*

[16] *Id.* at 804.

[17] *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012).

terminated under circumstances giving rise to an inference of discrimination."[18]  "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination."[19]

In this case, the parties agree that Plaintiff is a member of a protected class and that he was terminated from his position. They disagree over whether the circumstances give rise to an inference of discrimination.  Defendant argues that Plaintiff cannot establish that he was treated less favorably than similarly situated employees while Plaintiff argues that the evidence demonstrates that he was not treated the same as similarly situated employees.  Both parties focus on this fact when arguing whether the circumstances give rise to an inference of discrimination. Accordingly, the Court will consider whether there is a question of fact as to whether Plaintiff was treated differently from similarly situated individuals.

 "Individuals are considered 'similarly-situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.' "[20] "A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly

---

[18] *Id.* (quotation marks and citation omitted). Both parties set forth a slightly different variation of the prima facie case.

[19] *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005) (quotation marks and citation omitted).

[20] *E.E.O.C. v. PVNF, LLC*, 487 F.3d 790, 801 (10th Cir. 2007) (citation omitted).

situated."[21] Plaintiff's theory fails from the start because he cannot demonstrate that other individuals were similarly situated to him and treated differently.

Plaintiff seeks to compare himself to two other individuals.  The first individual, Paulsen, had been employed by Defendant for approximately twenty-four years, well outside the introductory period. He worked in a different department (Cold-End) than Plaintiff and under different supervisors. The other individual, Ralston, had been employed by Defendant as Safety Manager for approximately seven months. Although Ralston had only been employed for seven months, he was also outside his introductory period. As Safety Manager of the plant, he had different supervisors than Plaintiff and reported directly to the Plant Manager. Neither of these individuals was placed on a Final Warning. In contrast, Plaintiff was a new hire and his employment occurred entirely during his ninety-day introductory period. He worked in the Tempering Department, and his supervisors were Hicks and Sullivan. Plaintiff does not provide any evidence that any other employees who allegedly violated Defendant's Length of Hair policy were in their introductory period, reported to the same supervisors,[22] or were similarly situated in any manner.

In addition, Plaintiff cannot demonstrate that these individuals engaged in conduct of comparable seriousness.  Paulsen does not work in the same department, and there is no evidence that he must wear a packing jacket. Paulsen submitted an affidavit in which he averred that he

---

[21] *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

[22] Plaintiff contends that he, Paulsen, and Ralston all shared the same decision maker. The evidence of record belies Plaintiff's contention. These individuals were directly supervised by different supervisors. The human resources manager (Boone) may be involved in the ultimate employment decision, but that fact does not make him Plaintiff's supervisor. *See Kendrick v. Penske Transp. Servs. Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000) (stating that although a human resource manager "played a role in determining the disciplinary action," this evidence was insufficient to demonstrate that employees were similarly situated when they each had different immediate-level supervisors).

always kept his ponytail tucked into his shirt. With regard to Ralston, he did not work on the tempering floor like Plaintiff. Instead, he performed a daily safety inspection, but he did not come near to the machines. It is also undisputed that after Ralston was told to place his ponytail under a hardhat, he did so. Defendant provides evidence that Plaintiff repeatedly failed to secure his hair after being informed to do so.  Thus, Plaintiff fails to demonstrate a prima facie case as he cannot demonstrate an inference of discrimination because there is no indication that he was treated less favorably than similarly situated employees.

In essence, Plaintiff's argument is that because he was the only employee to wear dreadlocks, his discharge must have been due to his race. Plaintiff's argument first overlooks the fact that dreadlocks are not exclusive to African-Americans. Furthermore, as noted by at least one court, "Title VII prohibits discrimination on the basis of immutable characteristics, such as race, sex, color, or national origin. A hairstyle, even one more closely associated with a particular ethnic group, is a mutable characteristic."[23] Here, Plaintiff fails to demonstrate a genuine issue of material fact as to whether Defendant discriminated against him on the basis of his race.

### 2. *Legitimate, nondiscriminatory reason*

Even if Plaintiff could establish a prima facie case, Defendant articulates a legitimate, nondiscriminatory reason for terminating Plaintiff.  Defendant need not "litigate the merits of the reasoning, nor  . . . prove that the reason relied upon was bona fide, nor  . . . prove that the

---

[23] *E.E.O.C. v. Catastrophe Mgmt. Sol.*, 11 F. Supp. 3d 1139, 1143 (S. D. Ala. 2014) (discussing several cases in which courts found no discrimination on the basis of hairstyles or grooming policies).

reasoning was applied in a nondiscriminatory fashion."[24]   Instead, Defendant needs only to "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII."[25]

Here, Defendant states that it terminated Plaintiff due to his violation of its Length of Hair policy, attendance issues, and several deficiencies in work performance. These reasons are race-neutral, nondiscriminatory reasons. Thus, Defendant meets its burden.

### 3.  Pretext

Plaintiff must now present sufficient evidence for a jury to reasonably conclude that Defendant's race-neutral reason for dismissal is merely a pretext concealing intentional racial discrimination. Evidence revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation for the termination may support an inference of pretext.[26]  A plaintiff typically employs three different methods to demonstrate pretext:

> (1) evidence that the defendant's stated reason for the adverse employment action was false; (2) evidence that the defendant acted contrary to a written . . . policy prescribing the action to be taken by the defendant under the circumstances; or (3) evidence that the defendant acted contrary to an unwritten policy or contrary to [the employer's] practice when making the adverse employment decision affecting the plaintiff.[27]

Regardless of the method that the plaintiff chooses, the Court must view "the facts as they appear to the person making the decision to terminate."[28]  In addition, the Court must not second-guess business judgments made in good faith.[29]

---

[24] *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007) (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)).

[25] *Id.* (quoting *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000)).

[26] *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (citation omitted).

[27] *Id.* (quoting *Kendrick*, 220 F.3d at 1230).

[28] *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 948 (10th Cir. 2011) (quoting *Kendrick*, 220 F.3d at 1231).

-14-

Plaintiff contends that Defendant's reason for termination is pretext for discrimination on the basis of three reasons: (1) Defendant's policies were not consistently applied to all employees, (2) evidence undermines Defendant's articulated reason for terminating Plaintiff, and (3) Plaintiff was not given the means to remedy the alleged safety issues.

*a.   Inconsistent application of policy*

With regard to Plaintiff's first argument, he argues that Defendant's Length of Hair policy was not consistently applied because other employees (Paulsen and Ralston) were not terminated. When determining whether employees were treated disparately, the employees must be similarly situated and must have engaged in comparable work violations.[30] As noted above, Paulsen and Ralston are not similarly situated and did not engage in comparable work violations. Thus, Plaintiff's first argument fails.

*b.   Falsity of Reason*

Plaintiff's second argument is that evidence undermines Defendant's articulated reason for termination. Defendant states it terminated Plaintiff for violation of its Length of Hair policy, attendance issues, and several deficiencies in work performance. Plaintiff argues that he was never given a disciplinary action for his hair and never given a final warning for his hair.  He contends that because Defendant only gave him a written final warning for attendance and he did not have another attendance issue, Defendant's reason for terminating him on that basis must be false.

It is undisputed, however, that Defendant provided several reasons for termination, and attendance was simply a factor that played a part. It is also undisputed that Defendant gave

---

[29] *Id.* at 947.

[30] *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167-68 and 1171, n. 11 (10th Cir. 2007).

Plaintiff a "Rule of Conduct Warning" for attendance, and on this same form, Defendant explained the safety aspect of his hair and that Plaintiff's hair needed to be secured properly. It is also undisputed that Plaintiff's supervisors verbally told him several times that he needed to secure his hair appropriately.  Plaintiff was in the introductory period of his employment, and he understood that Defendant would closely scrutinize his work.

In addition, Plaintiff contends that the circumstances surrounding his hair violations are questionable because his supervisor's written documentation did not adequately or appropriately document the hair violations. Again, there is no dispute that Plaintiff was verbally told repeatedly, and given one written notation, that he needed to secure his hair appropriately.  There simply are not such inconsistencies and incoherencies in Defendant's articulated reason to render it unbelievable. Thus, Plaintiff's second argument that Defendant's reason for termination is pretext for discrimination fails.

### c.   Not given the means to remedy to safety issue

Finally, Plaintiff asserts that he was not provided the means to remedy his violations. He claims that had he been given a larger packing jacket, he could have properly secured his hair inside it. He claims that the Court is precluded from granting summary judgment because there is question of fact as to whether he was actually given a larger jacket.[31] The question of whether Plaintiff was given a larger packing jacket, however, is immaterial. It is undisputed that Plaintiff could have placed his hair inside the packing jacket that he had, and he failed to do so.[32] To demonstrate pretext, a plaintiff must show weaknesses, contradictions, or implausibilities in

---

[31] Plaintiff states that he was not given a larger packing jacket, while two of Defendant's employees state that he was given one.

[32] Although a larger one may have made it easier to place his hair inside, there is no evidence before the Court that Plaintiff was unable to place his hair inside the packing jacket that he had.

Defendant's explanation for the termination.  Plaintiff fails to do so. Thus, Plaintiff fails to raise a genuine issue of material fact as to whether Defendant's reason for termination was pretext for race discrimination. Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiff's race discrimination claims.

### B.  Retaliation Claims under Title VII and § 1981

Absent direct evidence of retaliation, retaliation claims brought under Title VII or § 1981 are analyzed under the *McDonnell Douglas* framework.[33]  Plaintiff must first demonstrate a prima facie case of retaliation.[34]  If Plaintiff does so, the burden shifts to Defendant to articulate a legitimate and nondiscriminatory reason for its decision.[35]  Finally, the burden shifts back to Plaintiff to demonstrate that the employer's reason is merely pretext.[36]

#### 1.  Prima facie case

To establish a prima facie case of retaliation, a plaintiff must demonstrate that "(1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between his protected activity and the adverse employment action."[37] Defendant contends that Plaintiff did not engage in protected activity.

"Protected activity for the purposes of Title VII retaliation includes either (1) participating in or initiating a Title VII proceeding or (2) opposing discrimination made unlawful

---

[33] *Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014).

[34] *Estate of Bassatt v. Sch. Dist. No. 1*, 775 F.3d 1233, 1238 (10th Cir. 2014).

[35] *Id.*

[36] *Id.*

[37] *Davis*, 750 F.3d at 1170 (citation omitted).

by Title VII."[38]  An employee's complaint about unfair treatment without any indication that the employee believed the unfair treatment was unlawful race discrimination will not support a retaliation claim.[39]  "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]."[40]  Furthermore, an employer cannot engage in retaliation if he is unaware that the employee engaged in protected activity.[41]

Here, Plaintiff did not engage in protected activity.  Plaintiff never told his supervisor that he believed that he was being discriminated against on the basis of his race.  Plaintiff states that he told his supervisors that he was being treated unfairly on the basis of his hair.  Although Plaintiff was the only African-American employee who wore his hair in dreadlocks, it is uncontroverted that his specific hairstyle was never discussed during his employment with AGC. In addition, dreadlocks are not exclusively worn by African Americans.[42]  Plaintiff contends that his protected activity was his statement to his supervisor that a "white guy" with long hair in another department did not place his hair inside a jacket. Yet, nothing in this statement would indicate that Plaintiff was protesting race discrimination. Indeed, it relates to his hairstyle. As noted above, a vague reference to unfairness without any indication that the unfairness is related

---

[38] *Boese v. Fort Hays State Univ.*, 814 F. Supp. 2d 1138, 1146 (D. Kan. 2011) (citation omitted); *see also Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004) (holding that "a vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or another category protected by Title VII) does not constitute protected activity and will not support a retaliation claim").

[39] *See Peterson v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002).

[40] *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).

[41] *Petersen*, 301 F.3d at 1188-89.

[42] Plaintiff also admits that he was not subject to any racial slurs, racial jokes, or racially offensive images.

-18-

to race is insufficient to be considered protected activity. Thus, Plaintiff does not meet the first element of a prima facie case of retaliation based upon his race.

### 2. *Legitimate Reason*

Even if the Court were to conclude that Plaintiff could demonstrate a prima facie case of retaliation, Plaintiff's claim still fails. The second step of a retaliation claim requires Defendant to set forth a legitimate, non-retaliatory reason for its termination decision. As noted above, Defendant does so because it states that it terminated Plaintiff for violation of its Length of Hair policy, attendance issues, and several deficiencies in work performance.    Accordingly, Defendant satisfies its burden at this step.

### 3. *Pretext*

The last step for a retaliation claim requires Plaintiff to set forth evidence of pretext. Plaintiff fails to do so. Plaintiff relies upon the same reasoning as above in his racial discrimination claim to support his theory that Defendant's reason for termination is pretext for retaliation.  As the Court noted above, Plaintiff's arguments fail to show such weaknesses or implausibilities in Defendant's reason for termination to provide an inference of retaliation on the basis of Plaintiff's race.  Thus, the Court grants Defendant summary judgment on Plaintiff's retaliation claims brought under Title VII and § 1981.

### C. Summary

In sum, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's race and retaliation claims under Title VII and § 1981.  Because the Court grants summary judgment in Defendant's favor on the entirety of the claims, it is unnecessary to consider Defendant's arguments regarding dismissal of Plaintiff's back pay claim—a portion of  his Title VII and §

1981 claim. Similarly, it is unnecessary to address Defendant's Motion for Sanctions for Spoliation of Evidence because Plaintiff no longer has viable claims.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 29) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Sanctions for Spoliation of Evidence (Doc. 27) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiff's Unopposed Motion for Leave to File Excess Pages in Opposition to Defendant's Motion for Summary Judgment (Doc.41) is **GRANTED**. The Court considers Plaintiff's opposition (Doc. 37) already filed.

**IT IS SO ORDERED**.

Dated this 28th day of October, 2015.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE